**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | **CHAPTER 7** |
| | ) | |
| **GEORGE WINSTON HARRINGTON, JR. &** | ) | **CASE NO. 08-70439** |
| **DEBORAH ANN HARRINGTON** | ) | |
| | ) | |
| **Debtors.** | ) | |

_____

## <u>MEMORANDUM DECISION</u>

George and Deborah Harrington (collectively, the "Debtors") filed a voluntary

Chapter 7 petition in the Eastern District of Tennessee on November 21, 2007, commencing the

current bankruptcy case, which was transferred from the Eastern District of Tennessee to this

Court by Order entered March 11, 2008.  Subsequently, on June 10, 2008, the United States

Trustee filed a Motion to Dismiss the case under 11 U.S.C. § 707(b)(1) ("the Motion") on the

ground that the petition was an abusive filing.  The Motion was set for trial on January 21, 2009,

after which counsel for the parties made oral arguments and the Court took the matter under

advisement.  Based on the following findings of fact and conclusions of law, this Court

concludes that the Debtors' petition constitutes an abusive filing and, therefore, grants the

Motion.

FINDINGS OF FACT

The parties filed a Stipulation of Fact on January 8, 2009 in which they agreed

that the following facts are not disputed.[1]  The Debtors, who live in Bristol, Virginia, and who

have no dependents, have an annualized Current Monthly Income, according to the Official

_____

[1] The parties filed an Amended Stipulation on January 30, 2009 which adds that the
Debtors' case was initially filed in the Eastern District of Tennessee on November 21, 2007 and
replaces the words "interrogatories" with "stipulations" in stipulation number 9.

Form 22A (the "Means Test Form") filed contemporaneously with their petition, of $109,570,[2]

which far exceeds the applicable median family income of $59,423.  Mr. Harrington is employed

as a pharmacist.  Mrs. Harrington is currently unemployed, and she was last employed in January

2007 with the Sullivan County Health Department.  The Debtors represented on their Schedule I,

which was filed contemporaneously with the Debtors' bankruptcy petition on November 21,

2007, that Mr. Harrington's monthly gross income was $7,200.[3]  After deductions for payroll

---

[2] The figure which the parties stipulate to is significantly higher than the annualized income which is apparent from the basic calculation of Mr. Harrington's bi-weekly income of $3,600 as discussed below, multiplied by the 26 bi-weekly periods in a calendar year.  Based on that calculation, the Debtors' income would be $93,600.  The figure to which the parties stipulated is $15,970 greater than the Debtors' income as it appears from the testimony and exhibits provided to this Court.  In attempting to reconcile the difference, the Court examined the Debtor's Means Test Form, and discovered that, on this form, Mr. Harrington's monthly income is listed as $7,800, which figure is higher than the $7,200 figure representing the monthly income on the Debtors' Schedule I.  This figure, however, is identical to the Debtors' monthly income after taking into account the miscalculations noted at trial and discussed in more detail below.  That the correct figure appears on the Means Test Form and not on Schedule I gives this Court some concern and might reasonably be considered to call into question the Debtors' contention that the Schedule I miscalculation was simply an honest mistake.  Moreover, when looking at the Means Test Form more closely, this Court has identified two additions to the Debtors' monthly income which were not listed on the Debtors' Schedule I which explain fully the difference between the Means Test Form annualized income figure and the annual income figure as noted above of $93,600.  The Means Test Form shows a monthly income of $309 for "interest, dividends, and royalties" and it shows a monthly income of $1,021.87 from a stock distribution by Regions Financial Corporation.  Apparently, these numbers equal an average monthly distribution from dividends and other consideration related to the Debtors' ownership and subsequent sale of their shares of stock in Regions Financial Corporation which occurred over the 6-month period prior to the filing of the Debtors' petition.  While the Debtors have received this consideration in exchange for the sale of their ownership in the Regions Financial stock shares and, therefore, their actual monthly income going forward from the petition date is closer to the $93,600 figure, the fact that the Debtors have received such distributions raises some questions as to why the Debtors, despite these various sources of additional income, still incurred over $120,000 in consumer debt since 2005.  Thus, these circumstances only serve to support the Court's ultimate conclusion that the Debtors' petition is an abusive filing.

[3] This monthly income would yield an annualized figure of $86,400.

2

taxes, social security, and $493 for insurance, the Debtors' 2007 monthly net monthly income

was listed as $4,779 in their Schedule I.  However, the gross income figure listed on Schedule I

was a miscalculation.  At the time of filing, Mr. Harrington was earning a gross income of

$3,600 every two weeks, or $7,800 per month.  Moreover, Mr. Harrington earned, as of the date

of the Stipulation, a gross bi-weekly income of $3,800, or a gross monthly income of $8,233.

Mrs. Harrington reports no income on Schedule I.

According to Schedule J, the Debtors have monthly expenditures of $4,771, and

their reported monthly income, after payroll deductions exceeds their monthly expenses by

$8.31.  The Debtors list $669.76 for their medical and dental expenses, which amount is a

monthly average based on out of pocket medical expenses incurred in 2007.  These expenses

included $9,444 for oral surgery performed on Mrs. Harrington in 2007.  Between January 1,

2008 and October 11, 2008, the Debtors have incurred $4,006 in out of pocket charges for

prescriptions.  Moreover, Mrs. Harrington anticipates buying dentures at an estimated additional

cost of $3,200 in 2009.

Additionally, the Debtors listed on Schedule A their ownership of real property in

Bristol, Virginia which they value at $130,000, and the Debtors also listed various items of

personal property on Schedule B with a cumulative value of $91,452, specifically including two

vehicles, a 2006 Toyota valued at $12,020 and a 2001 Mitsubishi valued at $5,310.[4]  The

Debtors, however, also listed secured claims totaling $151,216, including first  and second

mortgages on their residence securing debts of $105,024 and $34,356, respectively, and a lien on

---

[4]  The Debtors also listed as personal property several savings and checking accounts,
various household items, interest in a 401(k) retirement plan, and various pieces of jewelry.

the 2006 Toyota securing a debt of $11,836.[5]  In addition to the secured debts, the Debtors'

Schedule E lists a priority debt owed to the IRS in the amount of $1,950, and their Schedule F

lists general unsecured debt totaling $123,052, all of which has been incurred since January

2005.[6]  The debts are primarily consumer debts.  The following chart identifies those debts

appearing on the Debtors' Schedule F.

| Creditor (Type of Account) | Date Opened | Last Active | Amount of Debt |
|---|---|---|---|
| American Express (Credit Card) | 4/1/06 | 10/1/07 | $299 |
| American Express (Credit Card) | 4/1/06 | 10/1/07 | $179 |
| Bank of America (Credit Card) | 10/1/99 | 4/1/07 | $13,505 |
| Bank of America (Credit Card) | 2/1/02 | 2/9/07 | $11,534 |
| Bank of America (unspecified) | 10/1/99 | 4/1/07 | $13,232 |
| Bank of America (Charge Account) | 2/1/02 | 4/1/07 | $11,534 |
| Bank of America (Charge Account) | 8/1/04 | 4/1/07 | $8,617 |
| Chase (Credit Card) | 11/1/96 | 4/1/07 | $17,494 |
| Chase (Credit Card) | 11/1/98 | 4/1/07 | $15,208 |
| Chase (Credit Card) | 2/1/04 | 4/1/07 | $4,063 |
| Discover (Credit Card) | 3/1/98 | 3/1/07 | $8,542 |
| Discover (Credit Card) | 4/1/05 | 6/1/07 | $5,977 |
| GEMB/Belk (Charge Account) | 5/1/03 | 10/7/07 | $1,290 |

---

[5] The Debtors filed with their petition a statement attesting to their intent to reaffirm all
of the aforementioned secured debts.  As of the date of this Decision, the Debtors have
reaffirmed only the first mortgage held by HSBC.

[6]  Aside from a debt totaling $316 for "Medical Collections," the remainder of the
Debtors' unsecured debt includes 19 different credit accounts held by the Debtors.  Though
many of these accounts were opened prior to 2005, the Debtors have testified and stipulated to
the fact that the amounts reflected in their Schedule F for credit card and retailer charge account
debts have all been incurred since the refinancing of their home in early 2005.

4

| GEMB/Care Credit (Charge Account) | 3/1/06 | 10/1/07 | $538 |
| GEMB/JCP (Charge Account) | 5/1/04 | 9/13/07 | $172 |
| HSBC NV (Credit Card) | 8/1/04 | 9/1/07 | $89 |
| Narfe Premier FCU (Credit Card) | 7/1/96 | 2/16/07 | $10,199 |
| WFNNB/Dress Barn (Charge Account) | 1/1/99 | 10/11/07 | $183 |
| WFNNB/Lane Bryant (Charge Account) | 10/1/03 | 10/1/07 | $81 |

Prior to January 2005, however, the Debtors' home was completely unencumbered. At that time, the Debtors took out two mortgages on their home, both of which account for the debts currently secured by the Debtors' home as discussed above. The proceeds of the mortgage loans were used by the Debtors to pay off their unsecured debt at the time and to alleviate a black mold problem in the home.

With the parties having agreed to the foregoing, the matter proceeded to trial, during which Deborah Charles[7] and both Debtors testified. During the trial, both parties agreed that the Debtors were in error when they listed $7,200 as their monthly income in Schedule I. The error was attributed to the fact that Schedule I reflected Mr. Harrington's earnings as $3,600 paid twice a month, when, in fact, the pay period used by his employer was a bi-weekly cycle. As a result, Mr. Harrington's gross annual income, calculated by multiplying $3,600 by 26 bi-weekly pay cycles in a year, totals $93,600, which when divided by 12 months, equals a monthly salary of $7,800. This amount is $600 more than the figure reported on the Debtors' schedules.

---

[7] Ms. Charles is a paralegal in the office of the United States Trustee, and her testimony was offered to support the United States Trustee's calculations regarding the Debtors' monthly income and disposable income.

The United States Trustee also presented, without objection, a payroll journal for the months of January through March of 2008.  The pay journal reflects a wage increase as of January 2008 from $3,600 bi-weekly to $3,800 bi-weekly, which amounts to a monthly salary of $8,233.33. None of these calculations includes any amount received by the Debtors as a tax refund, even though they received a refund in the amount of $5,300 for the 2007 tax year.

As indicated by the parties in their Stipulation, the Debtors reported a net monthly income of $4,779.49 on their Schedule I.  However, this figure is calculated using the same erroneous assumption relied upon when reporting the $7,200 monthly gross income as discussed above.  Adjusting the net income to properly reflect a bi-weekly pay period, using the same calculations as noted above, the Debtors' net monthly income as of the filing date was $5,177.78. This amount is $398.29 more than the net monthly income listed in the Debtors' Schedule I. Based on the unchallenged calculations made by the office of the United States Trustee, the Debtors' net monthly income in 2008 was $5,514.77.

In the Debtors' Schedule J, they list the following monthly expenses: (1) $1,700 for mortgage payments, (2) $135 for electricity, (3) $40 for water and sewer; (4) $70 for telephone; (5) $41 for internet service; (6) $120 for cellular telephone service; (7) $8 for garbage pick-up; (8) $130 for cable television; (9) $40 for gas utility service; (10) $100 for home maintenance; (11) $500 for food; (12) $50 for clothing; (13) $25 for laundry and dry cleaning; (14) $669.76 for medical and dental expenses; (15) $250 for transportation expenses; (16) $50 for recreation; (17) $226 for homeowner's, life and automobile insurance; (18) $183.42 for personal tax and real property tax liability; (19) $283 for car payments; and (20) $150 for miscellaneous personal expenses.  The expenses itemized on Schedule J total $4,771.18, leaving

the Debtors with $8.31 disposable income when using the income figures appearing on their

Schedule I.  Moreover, according to a handwritten list of monthly bills for 2008, the Debtors

increased their miscellaneous personal expenses to $200 per month, which amount reflects the

Debtors' payment on a credit card in the name of the Debtors' daughter.  Additionally, Mr.

Harrington testified that the monthly expense for car insurance will increase by $50 in 2009 as a

result of two car accidents for which Mrs. Harrington was responsible.

       According to the rebuttal testimony of Ms. Charles, the Debtors' Schedule J

reflects 2007 expenses.  According to the handwritten list of monthly bills provided by the

Debtors and admitted as an exhibit without objection, the Debtors' 2008 monthly bills, as listed

on the exhibit, total $3,239.97.  The exhibit, however, is an incomplete list of expenses that does

not include food, transportation, and medical expenses.  When including the figures, as taken

from the Debtors' Schedule J for those expenses, the Debtors' monthly expenses for 2008 total

$4,459.73.  Moreover, factoring in the $50 per month increase in automobile insurance

premiums, the going forward expenses of the Debtors total $4,509.73, which amount is $261.45

less than the amount listed on the Debtors' Schedule J.

       According to the unchallenged testimony of Mrs. Harrington, the Debtors'

medical expenditures, which are unspecified in amount, result from the following conditions: (1)

Mrs. Harrington's dentures, which cannot be properly repaired, make it difficult for her to eat

and talk, and she intends to replace them in 2009; (2) one of her knees has been overtaken

completely by arthritis, and she will continue to receive injections of artificial fluids until

surgery can be performed; (3) she is receiving ongoing psychiatric treatment for anxiety; and (4)

Mrs. Harrington is expected to undergo unspecified "female" surgery.  Because of the medical

and psychiatric conditions she faces, both Debtors testified that Mrs. Harrington does not leave the home except with her husband.

According to Mr. Harrington, the health insurance policy covering the Debtors is an 80/20 policy, whereby the insurance company pays for 80% of the cost associated with doctor and hospital visits and the Debtors pay the remaining 20%, after a one-time annual deductible of $150 per person is paid. Additionally, after this deductible is paid, the Debtors have a co-payment obligation for prescription drugs of either $10, $30, or $50. The United States Trustee challenged neither the amount of the medical expenses as listed by the Debtors in their Schedule J nor their ongoing nature.

## CONTENTIONS OF THE PARTIES

In his Motion to Dismiss the United States Trustee observes initially that 11 U.S.C. § 707(b) gives the Court discretion to dismiss a Chapter 7 petition under certain circumstances. Citing § 707(b)(3), which requires that this Court consider whether the petition was filed in bad faith or whether the totality of the circumstances of the debtors' financial situation demonstrates abuse, the United States Trustee notes initially that the Debtors have significantly understated their monthly income. The United States Trustee then asserts that the Debtors' Schedule J includes questionable monthly expenses of $41 for internet service, $120 for cell phone service, $130 for cable television and $669 for projected medical expenses.[8] The United States Trustee contends that if the schedules were adjusted accordingly to reflect accurately the Debtors' monthly income and to reduce the questionable expenses, then the

---

[8] The United States Trustee appears to have abandoned any serious contention that the medical expenses are unwarranted, as is apparent from the record of the evidentiary trial held on this matter.

8

Debtors would have significant disposable income available to repay some portion of their unsecured debt.  Accordingly, the United States Trustee asserts that this ability to repay, under the totality of the circumstances, is an abuse within the meaning of § 707(b)(3) and argues that the Court should therefore dismiss the case pursuant to § 707(b)(1).  The United States Trustee reasserted the arguments contained in the Motion to Dismiss at trial with the exception of the Debtors' medical expenses, which he no longer challenges.

The Debtors have filed no responsive pleading to the Motion to Dismiss.  Instead, the Debtors relied on their testimony and arguments at trial.  Because a significant portion of the United States Trustee's case was based on the fact that Mr. Harrington received a raise after the initial filing of the petition in 2007, counsel for the Debtors argued primarily that, when analyzing such a motion, the Court should look solely to the Debtors' financial situation at the time of filing and that Mr. Harrington's increase in income after the filing is irrelevant to the Court's decision whether to grant or deny the United States Trustee's Motion.  Moreover, counsel for the Debtors argues that the expenses are good faith estimates, and that, even if there is room to decrease some of the questionable expenses appearing on the Debtors' Schedule J, many of the standard expenses could be increased as those expenses were understated in their schedules.  Additionally, after the conclusion of the arguments at trial, counsel for the Debtors requested that, should this Court be inclined to grant the Motion, it give the Debtors time to determine whether to allow the case to be dismissed or to convert it to Chapter 13.

## CONCLUSIONS OF LAW

This Court has jurisdiction over this proceeding by virtue of the provisions of 28 U.S.C. §§ 1334(a) and 157(a) and the delegation made to this Court by Order from the District

9

Court on July 24, 1984.  A motion to dismiss for abuse is a matter concerning the administration

of the estate and a "core" bankruptcy matter pursuant to 28 U.S.C. § 157(b)(2)(A).

Pursuant to 11 U.S.C. § 707(b)(1), the Court "may dismiss a case filed by an

individual debtor . . . whose debts are primarily consumer debts . . . if it finds that the granting of

relief would be an abuse of the provisions of this chapter."  Significantly, the 2005 Amendments

to the Bankruptcy Code eliminated the requirement that the Court find a *substantial* abuse and

also eliminated the prior presumption in favor of granting Chapter 7 relief.  *See* Bankruptcy

Abuse Prevention and Consumer Protection Act, § 102(a)(1) ("BAPCPA").  BAPCPA added to

the Code §§ 707(b)(2) and (3), the former of which provides a calculation to determine whether

the presumption of abuse arises,[9] which the Court is directed to consider in determining under §

707(b)(1) whether granting Chapter 7 relief in a particular case would be an abuse.  If the

presumption of abuse does not arise, or if such presumption is rebutted, § 707(b)(3) provides that

the courts may then consider whether a debtor filed his or her petition in bad faith and whether

the totality of the circumstances of a debtor's financial circumstances indicates an abusive filing.

*Presumption of Abuse Arising from Ability to Pay*

As indicated above, it is necessary to determine initially whether a presumption of

abuse arises from the Debtors' ability to pay.  Under § 707(b)(2) such presumption arises when

the debtor's current monthly income less the debtor's monthly expenses under the National and

Local Standards along with any additional reasonable average monthly expenses (the "net

---

[9] Under § 707(b)(2) the presumption of abuse arises if a debtor's current monthly income
reduced by certain enumerated expenses, multiplied by 60, is less than the lesser of "(I) 25
percent of the debtor's nonpriority unsecured claims in the case, or $6,000, whichever is greater;
or (II) $10,000."  The amounts noted in this formula in the preceding quoted language are those
in effect as of the filing date of the Debtor's case.

disposable income"), multiplied by 60, is less than the lesser of 25 percent of the debtor's

nonpriority unsecured claims or $10,000.  In this case, the Debtors' nonpriority unsecured claims

total $123,052, and 25% of that number is $30,763.  Therefore, this Court must determine

whether the Debtors' monthly income reduced by expenses and multiplied by 60 is less than

$10,000.  In conjunction with this analysis, the parties disagreed at trial over the applicable time

period the Court should analyze when determining whether the presumption of abuse arises.  In

other words, the United States Trustee argues that this Court should look at the Debtors' income

and expense figures for 2008, which more closely reflect the Debtors' position at the current

time, while the Debtors urge this Court to look at a snapshot of their financial situation as it

existed in 2007 when they filed their petition.  The question is certainly an interesting one.

However, the Court will decline the opportunity to decide the issue, as it concludes that the

presumption of abuse arises even when limiting the analysis to include only the Debtors'

financial situation as it existed in 2007.

    According to the Debtors' Schedule J, filed contemporaneously with their petition

in 2007, the Debtors' net disposable income is $8.31, which figure is based on the calculation

that their net monthly income was $4,779.49.  Using this figure, the Debtors' net disposable

income multiplied by 60 totals $499, a figure certainly much less than the $10,000.  However,

the United States Trustee questions whether their monthly income was understated and whether

the expenses were unnecessary and unreasonable.  The United States Trustee first asserts that the

Debtors' 2007 income was understated by $398.29, as their actual net monthly income at the

time was $5,177.78.  As such, using the Debtors' expenses in 2007 as they were listed on their

Schedule J, the Debtors have an actual net disposable income of $406.60, which number

11

multiplied by 60 totals $24,396. Under this calculation, the presumption of abuse arises.

However, the Debtors argue that some of their expenses could be increased as they are less than the amounts specified under the National and Local Standards. Reading between the lines of this argument, however, the Debtors appear to take the position that they should be entitled to use their actual expenses as listed on Schedule J, and add any amounts to that list of expenses by which their totals per category of allowable expenses are less than the IRS Standards. Certainly, this argument advanced by the Debtors is based on § 707(b)(2)(A)(ii) of the Bankruptcy Code. However, the Debtors must also accept any reductions to their expenses, at least for the purposes of determining whether the presumption of abuse arises, for any actual expenses which exceed the allowable standards under this Section of the Code. After all, the Code provides that Courts are *only* to look at the expense amounts specified under the IRS National and Local Standards, the Debtors' actual expenses for categories specified as Other Necessary Expenses listed by the IRS for the area in which the Debtors reside, reasonably necessary health insurance, any expenses necessary to protect the Debtors from family violence, and any actual and continuing out-of-pocket expenses for the medical care of a household member. As such, after looking at the IRS National and Local Standards regarding the applicable allowable expenses for food, clothing, and miscellaneous expenses, mortgage expenses, non-mortgage expenses including utilities, non-ownership transportation costs, ownership costs of transportation as is required by §707(b)(2)(A)(ii) of the Code, the Debtors' allowable living expenses are $3,189. After adding the $669.76 figure listed on the Debtors' Schedule J for out-of-pocket medical expenses, which this Court accepts as accurate, the allowable expenses under the Code total $3,858.76. Thus, for the purposes of determining

whether the presumption of abuse arises, the Debtors' monthly net disposable income is

$1,319.02, which amount multiplied by 60 is $79,141.20.  As a result of this analysis, the Court

concludes that the presumption of abuse arises.

<em>Totality of Circumstances</em>

This Court's decision is further supported by § 707(b)(3) which provides that,

even when no presumption of abuse has arisen or has arisen but has been rebutted, the Court

"shall consider [whether] the totality of the circumstances . . . of the debtor's financial situation

demonstrates abuse."  11 U.S.C. § 707(b)(3)(B).  In so doing, this Court understands and

appreciates that the Debtors continue to face the medical conditions suffered by Mrs. Harrington

and the resultant decrease in income and increase in expenses.  However, the Debtors' monthly

income is still substantial enough that the Debtors should face the obligation to apply at least a

portion of their income to paying their creditors if they wish to seek a discharge of over

$120,000 in unsecured debt from this Court.  While the Debtors presented arguments that their

expenses are all actual and necessary, a closer look at many of those expenses will reveal that the

totality of the Debtors' financial situation demonstrates abuse.

The Debtors testified that Mrs. Harrington, as a result of her ongoing medical

conditions, does not leave the home without her husband being present.  However, the Debtors

own two vehicles, a 2006 Toyota on which they continue to make monthly car payments of

$283[10] and a 2001 Mitsubishi, which is completely unencumbered by any security interest.  The

Debtors' current situation only requires them to own one car.  The surrender of the Toyota would

---

[10] According to the Debtors' Schedule D, the Toyota had only 11,000 miles on it as of the
date the petition was filed, and the Debtors obtained the vehicle on January 1, 2006.

reduce, at a minimum, their living expenses by the $283 per month car payment and the personal property taxes associated with its ownership, which additional money could then be provided to the unsecured creditors.  Moreover, the Debtors testified that Mrs. Harrington has a cellular telephone.  This additional expense of $120 per month is unnecessary considering the facts that (i) Mrs. Harrington does not leave the home by herself, and (ii) the Debtors have traditional telephone service to that home at a cost of $70 per month.  The Debtors also pay $130 per month for cable television.  While the Court accepts that cable television service at some level is reasonable and appropriate in light of the fact that Mrs. Harrington is effectively confined to the home, a $130 per month charge solely for cable television suggests that the Debtors have chosen a "top-of-the-line" level of premium service which is inappropriate in light of their obligations to their creditors.  Finally, the Debtors testified that they contribute $200 per month to pay for credit card charges incurred by their daughter, who is a college graduate, while she was in college and being supported by them.  While this is certainly a kind gesture, and the undersigned Judge on a personal level empathizes with Mr. Harrington's desire to fulfill his commitment to the daughter to pay this account, the expense is unnecessary and unreasonable in light of the fact that the Debtors are essentially asking their own creditors to fund payment of this expense.  It would be strange indeed to consider a $200 per month voluntary payment on the daughter's credit card account as permissible under the "totality of circumstances" test under § 707(b)(3) when such amounts could not be allowed as a deduction under § 707(b)(2) in determining whether a presumption of abuse arises under that section,[11] especially considering the fact that

---

[11]  Section 707(b)(2)(A)(ii)(I) provides specifically: "Notwithstanding any other provision of this clause, the monthly expenses of the debtor shall not include any payments for debts."

14

there has been no suggestion that such daughter is currently dependent upon her parents. Because these expenses could, and should, be adjusted to increase the Debtors' disposable monthly income, this Court concludes that the Debtors' Chapter 7 bankruptcy petition under the "totality of circumstances" is abusive.

*Asserted Bad Faith Filing*

Finally, § 707(b)(3) also allows a court to dismiss a case, even where no abuse has been shown otherwise, when bad faith has been established. Although during the indicated period between January 2005 and October 2007 the Debtors ran up charges on 19 credit cards resulting in a filing date aggregate liability of $132,052, neither counsel for the Debtors nor counsel for the United States Trustee introduced any evidence regarding the specific individual charges which the Debtors made on these cards. Mr. Harrington testified that at least a portion of this debt was incurred as a result of the medical conditions suffered by his wife and necessary repairs to the home to alleviate a black mold problem, but clearly he had made no actual analysis or review of the account statements.[12] In the absence of solid evidence of precisely how these large balances came to be and in light of the facts that the Debtors lost Mrs. Harrington's income, that they have incurred substantial pre-petition expenses as a result of her myriad medical problems, and that the Debtors borrowed against the entire value of their then unencumbered home to pay credit card debt in 2005, this Court concludes that the United States Trustee's contention that the Debtors filed their petition in bad faith has not been established.

---

[12] Though Mr. Harrington testified that some of the charges made to the credit cards were for shoulder surgery and black mold removal, at least a portion of this testimony appears at odds with the Stipulation of Facts. Specifically, Stipulation 23 provides that the "[p]roceeds from the January 2005 mortgage loans were used to pay off all of the [D]ebtors' unsecured debts owed at that time, and to remediate a black mold problem in their house."

15

Moreover, the understatement of the Debtors' income at the time of filing as a result of calculating the pay period as occurring twice a month rather than bi-weekly is a common mistake made by bankruptcy filers and has been explained by the male Debtor to the Court's satisfaction. While the fact that the monthly gross income from Mr. Harrington's employment was correctly recorded in Form 22A but incorrectly in their Schedule I is admittedly troubling, the Court, taking into account Mr. Harrington's demeanor on the witness stand, attributes this inconsistency to negligence and not to any actual intent on the part of the Debtors to mislead the Court, the Trustee or their creditors. After all, it is from Form 22A that it is determined whether any presumption of abuse arises and both the correct and incorrect income figures reported placed the Debtors in the above median income category.

CONCLUSION

Based on the preceding, this Court concludes that the Debtors' Chapter 7 petition is an abusive filing. Unless they file within fifteen days of this date a motion to convert their case to Chapter 13, it will be dismissed without further notice or hearing.

This the 17th day of February, 2009.

William F. Stone, Jr.

_____
UNITED STATES BANKRUPTCY JUDGE